**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**Western Division**

FILED

US DISTRICT COURT

---

HONEYWELL INTERNATIONAL INC.,

Plaintiff,

v.

JAY P. HEFFERNAN,

Defendant.

---

Civil Action No.
05-_____-MKP

**VERIFIED COMPLAINT**

## INTRODUCTION

Honeywell International Inc. ("Honeywell") brings this action seeking injunctive relief

and damages against its former senior sales executive of 18 ½ years, Jay P. Heffernan

("Heffernan"). Honeywell has brought this action because Heffernan breached a nonsolicitation

and confidentiality agreement containing various restrictive covenants and because Heffernan

has disregarded several key common law obligations.

This action does not seek to prevent Heffernan from working for his current employer,

Tri-Ed Distribution, Inc. ("Tri-Ed"), a direct competitor of Honeywell. This action does seek

injunctive relief to protect against the wrongful conversion of Honeywell's valuable goodwill

that Heffernan possesses by virtue of his being paid by Honeywell to develop close, personal

relationships with Honeywell's customers in the regions that Heffernan oversaw during the past

18 ½ years. Furthermore, this action seeks to prevent Heffernan from disclosing Honeywell's

confidential and proprietary information, some of which he recently learned by attending

Honeywell's annual sales strategy meeting in Florida just a few days before resigning to join Tri-Ed.

## PARTIES

1.    Plaintiff Honeywell is a corporation organized and existing under the laws of the state of Delaware with its principal place of business located at 101 Columbia Road, Morristown, New Jersey  07962.

2.    Defendant Heffernan is a resident of the Commonwealth of Massachusetts, residing at 37 Greenwich Road, Longmeadow, Massachusetts  01106.

## JURISDICTION AND VENUE

3.    Personal jurisdiction exists over Heffernan because he lives within this District (28 U.S.C. § 101) and, upon information and belief, is presently engaged in conduct within this District that constitutes a breach of his contractual and legal obligations owed to Honeywell.

4.    Subject matter jurisdiction is founded upon 28 U.S.C. § 1332(a).  Honeywell is a corporation organized under the laws of the state of Delaware having its principal place of business in Morristown, New Jersey.  Heffernan is an individual who resides in Longmeadow, Massachusetts.  The amount in controversy in this matter exceeds the sum of $75,000, exclusive of interests and costs.

5.    Venue is properly laid within the United State District Court for the District of Massachusetts - Western Division, under 28 U.S.C. § 1391, because Heffernan resides within the Western Division of this judicial district and a substantial portion of events giving rise to the claims set forth herein occurred in this district.

## FACTS

### Heffernan's Relevant Employment History

6.      Heffernan commenced working for Alarm Device Manufacturing Company

("ADEMCO") on September 8, 1986.  At that time, ADEMCO was an unincorporated division

of its parent company called Pittway Corporation ("Pittway").

7.      On September 8, 1986, Heffernan entered into an agreement with Pittway that

contained certain restrictive covenants.  The agreement was entitled: "Sales Management, Sales,

Customer Relations and Other Key Employees Agreement Relating to Confidential Information

and Fiduciary Responsibilities."  A copy of the Agreement is made part hereof and is attached

hereto as "Exhibit A."

8.      Also on September 8, 1986, Heffernan executed an acknowledgement of his

receipt of Pittway's Conflict of Interest Policy which prevented him from misusing or disclosing

company confidential information or competing with his new employer.  A copy of Pittway's

Conflict of Interest Policy signed by Heffernan on September 8, 1986 is attached hereto as

"Exhibit B."

9.      Prior to joining ADEMCO, Heffernan had only two years of experience working

as a salesman in the alarm industry for a small company in eastern Massachusetts called

Lexington Alarm Company.

10.      ADEMCO has manufactured and sold hardware for residential and commercial

alarm systems since 1929.  ADEMCO is an established and reputable company in the security

industry.

11.      As a sales representative for ADEMCO, Heffernan sold to a customer base of

security alarm dealers and installers.  ADEMCO's customer base within any particular sales

territory was largely comprised of a large but finite group of alarm system sales and installation companies, many of which were small, family-owned alarm businesses. Because this customer base was finite, it was therefore critical that Heffernan forge long-term, personal relationships with the customers to keep their business.

12.     The credibility and relationships that Heffernan built with ADEMCO's customers was developed while he was associated with the ADEMCO name.

13.     The personal relationships that Heffernan forged with ADEMCO's customers constitutes ADEMCO's goodwill.

14.     In the course of his employment, Heffernan used the name and reputation of ADEMCO in order to facilitate sales and develop close relationships between ADEMCO and its customers.

### Heffernan's Restrictive Covenants

15.     On March 16, 1987, Heffernan entered into another agreement with Pittway that contained certain restrictive covenants. The agreement, which is identical to the one he signed on September 8, 1986, was entitled: "Sales Management, Sales, Customer Relations and Other Key Employees Agreement Relating to Confidential Information and Fiduciary Responsibilities" (the "Agreement"). A copy of the Agreement is made part hereof and is attached hereto as "Exhibit C."

16.     Also on March 16, 1987, Heffernan reaffirmed his understanding that he continued to be bound by Pittway's Conflict of Interest Policy by executing a confirmatory letter addressed to the Secretary of Pittway. A copy of Heffernan's Conflict of Interest Policy confirmation is attached hereto as "Exhibit D."

17.    The Agreement specifically contemplates that Pittway's rights could be assigned to a successor company. The definition of the term "Company" in the Agreement means Pittway Corporation, including its [ADEMCO] division and its subsidiaries, affiliated companies, "successors and assigns." See Exhibit C, p. 1. The Agreement further provides: "All [Heffernan's] obligations under this Agreement shall … inure to the benefit of the Company and its successors and assigns." See Exhibit C, pp. 2-3 (at ¶ 6).

18.    Pursuant to the Agreement, "Confidential Information" is specifically defined to mean:

> information disclosed to [Heffernan] or known by [him] as consequence of or through [his] employment by the Company, including information conceived, originated discovered or developed by [him], not generally known about the Company's business, operations, processes and products, including but not limited to information relating to research, inventions, discoveries, technologies, improvements, plans, developments, techniques, formulae, processes, machines, methods of manufacture, compositions, drawings, models, layouts, projects, purchasing, accounting, financial affairs, engineering apparatuses, assembly, quality control, laboratory analysis, testing, application, strategies, marketing, merchandising, selling, promotional materials, costs, prices, sales, customers, product development, trademarks and trade names, whether or not reduced to written or graphic form. See Exhibit C, p. 1.

19.    Pursuant to the Agreement, "Conflicting Product" means: "any product, technology or process of any person or organization other than the Company, in existence or under development, which resembles, competes or is potentially competitive with a product, technology or process of the Company." See Exhibit C, p. 1.

20.    Heffernan received compensation for his services rendered from Pittway and Honeywell for 18 ½ years after execution of the Agreement.

21.    Honeywell is Pittway's successor in interest and assignee with respect to Heffernan's obligations owed under the Agreement.

22.    In return for the compensation and other consideration provided by Pittway and

Honeywell, Heffernan agreed to four restrictive covenants in the Agreement (the "Restrictive

Covenants"). Specifically, Heffernan agreed:

> Except as instructed or authorized in writing by the Company, I will never directly or indirectly use, disseminate, disclose, lecture upon or publish any Confidential Information whether during or after my employment with the Company. See Exhibit C, p. 2 (at ¶ 2).

> Upon termination of my employment with the Company, all document, records, notebooks and other materials of any kind containing, referring or relating to Confidential Information, including copies thereof, then in my possession, whether prepared by me or others, will be left with the Company. See Exhibit C, p. 2 (at ¶ 3).

> During the term of my employment with the Company *and for an additional period of one year following termination of such employment* I will not directly or indirectly induce or attempt to induce any employee of the Company to quit or abandon his employ for any purpose whatsoever. See Exhibit C, p. 2 (at ¶ 4) (emphasis added).

> During the term of my employment *and for an additional period of one year following termination of such employment*, I will not, directly or indirectly, for myself or any Conflicting Organization, sell or offer for sale, or assist in any way the sale of Conflicting Products: (a) in any geographic area for which I had supervisory responsibility at any time during the one-year period prior to my termination from the Company; or (b) to any customer of the Company on which I called or for which I had supervisory responsibility during the one-year period prior to my termination from the Company. See Exhibit C, p. 2 (at ¶ 5) (emphasis added).

23.    Heffernan specifically acknowledged the need for injunctive relief to prevent the

violation or threatened violation of any of the four Restrictive Covenants:

> I acknowledge that the Confidential Information which I have is of a special, unique, unusual and outstanding character which gives it peculiar value, and that any disclosure of Confidential Information in violation of this Agreement would be injurious to the business of the Company and cannot be adequately compensated in an action at law. I further acknowledge that *violation or threatened violation* of any of the covenants contained in paragraphs 2 through 5 would be injurious to the business of the Company and cannot be adequately compensated in an action at law. I therefore agree that in the event of any such *breach or threatened breach* with respect to Confidential Information or paragraphs 2 through 5, *the Company shall be entitled to an injunction*

*restraining such breach or threatened breach* in addition to any other rights and remedies available under this Agreement or otherwise. See Exhibit A, p. 3 (at ¶ 7) (emphasis added).

24.     The Agreement is governed by the substantive law of the State of New York.

### Heffernan's Employment at Honeywell

25.     The relevant division of Honeywell -- Honeywell Security and Custom Electronics -- manufactures, sells and distributes residential and commercial security technology to alarm system vendors and installers throughout the country.

26.     On or about the first quarter of 2000, Honeywell acquired all the outstanding stock of Pittway.  The purchase price was approximately $2.1 Billion.  In so doing, Honeywell assumed all rights and obligations under Pittway's contracts.  Honeywell also purchased ADEMCO's/Pittway's goodwill and all of its customer relationships.

27.     In December 2001, Heffernan attended Confidential and Proprietary Information Control Training in Syosset, New York, where he learned about Honeywell's policies governing the use and protection of confidential information.  Heffernan signed an acknowledgement confirming his agreement to abide by Honeywell's confidential information policies.  A copy of Heffernan's acknowledgement form dated December 10, 2001 is attached hereto as "Exhibit E."

28.     In the years following 2001, Honeywell continued to release and update its Code of Business Conduct electronically via the company's Intranet.  A copy of the relevant portions of the Honeywell Code of Business Conduct that governed Heffernan immediately prior to his termination date is attached as "Exhibit F."

29.     In September 2003, Heffernan completed an electronic refresher training course on Honeywell's policies governing the use and protection of confidential information (see Exhibit F).

30.     During all of his years as a Honeywell employee (including the last twelve months of his employment, in accordance with the Restrictive Covenants), Heffernan was a senior-level District Sales Manager.  His sales territory covered the general areas of Western Massachusetts, the Hudson River Valley from the Albany region to the New Jersey border, and all of New Jersey.  This was a very lucrative territory which comprised approximate annual revenues in the $15 Million range.  Heffernan was solely responsible for sales within this territory.

31.     The geographic territory that Heffernan covered during the last 12 months of his employment at Honeywell included the following areas, identified by the first three digits of the postal zip code:

- Zone 12 (Northern New Jersey):   070-079,085-086,088-089

- Zone 58 (Southern New Jersey):   080-084,087

- Zone 14 (New York - Hudson River Valley):   124-127

- Zone 16 (Northeast New York):   120-123,128-129,133-135, 137-139

- Zone 18 (Western Massachusetts):   010-016

32.     Heffernan's primary duties as a Honeywell District Sales Manager included: (a) to help grow Honeywell's business within his geographic territory; (b) to constantly visit customers and establish and maintain customer relationships; (c) to be involved in offering special pricing options for various customers and project-specific pricing options; (d) constant prospecting of potential new customers; (e) working with Honeywell's distributor to identify conversion possibilities (i.e., where a local dealer switches the brand of alarm hardware that they sell and install) and to pursue that potential business; (f) to appear at Honeywell's distributor for "counter days" to appear personally to interact with customers; (g) to entertain valued customers

on occasion, when appropriate; (h) to appear at trade shows on behalf of Honeywell; and (i) to prepare business proposals for existing and prospective customers. Heffernan was expected to be a self-starter and direct and supervise his own efforts to accomplish these business goals within his territory.

33.     As a result of Heffernan's job duties and level within Honeywell, he had considerable first-hand customer relations experience. He knows what materials particular customers preferred to purchase, and how Honeywell would propose special pricing arrangements for particular customers. He knows how Honeywell goes about fashioning unique pricing options to accommodate customer conversions. These special pricing arrangements were confidential, formulated on a customer-by-customer basis, and were not published or distributed. Heffernan also knows which customer relationships may be the most vulnerable and why.

34.     As a senior sales representative for Honeywell, Heffernan sold to the same type of customers that he serviced while employed by ADEMCO. Honeywell's customer base within any particular sales territory was similarly comprised of a large but finite group of alarm system sales and installation companies, many of which were small, family-owned alarm businesses. The identities of Honeywell's potential clients are well known, and can be ascertained by reading the security alarm systems section of the Yellow Pages. Because the universe of potential customers was well known, it was therefore crucial for Heffernan to establish and maintain long-term, personal relationships with Honeywell's customers to keep their business.

35.     Honeywell paid Heffernan to pursue, establish and foster steadfast relationships with Honeywell's customers. Honeywell underwrote the additional costs beyond Heffernan's wages to accomplish this goal, including but not limited to travel and client entertainment expenses.

36.    The credibility and relationships that Heffernan built with Honeywell's customers was developed while he was associated with the Honeywell name.

37.    The vast majority of the customers that Heffernan serviced within his territory (during the last 12 months of his employment) were customers that he had developed over years of relationship building efforts.

38.    The personal relationships that Heffernan forged with Honeywell's customers constitutes Honeywell's goodwill.

39.    In the course of his employment, Heffernan used the name and reputation of Honeywell in order to facilitate sales and develop close relationships between Honeywell and its customers.

40.    Heffernan worked from his home in Longmeadow, Massachusetts when he was not traveling and visiting Honeywell's customers. In order to perform his job for Honeywell, Heffernan necessarily possessed numerous company documents and other materials containing Honeywell's Confidential Information at his home.

### Heffernan's Breach of Confidentiality and Non-Compete Agreement

41.    On or about January 31, 2005, three former senior executives of ADEMCO acquired a controlling interest in Tri-Ed.

42.    Tri-Ed sells and distributes, among other things, security alarm hardware for sale to the commercial and residential alarm system sales and installation markets nationwide. Tri-Ed does not sell or distribute any Honeywell security products; rather, it sells and distributes the security products of Honeywell's competitors.

43.    Tri-Ed is a Conflicting Organization that sells Conflicting Products as defined by the Agreement.

44.    Upon information and belief, Tri-Ed contacted Heffernan prior to January 17, 2005, in an attempt to induce him to leave Honeywell and join Tri-Ed after the acquisition.

45.    Upon information and belief, Heffernan interviewed with Tri-Ed and obtained an employment offer on or before January 17, 2005.

46.    During the week of January 17, 2005, Honeywell's Security and Custom Electronics division hosted its annual national sales strategy meeting in Florida.  All of its sales managers from around the country attended, including Heffernan.  At the meeting, Honeywell executives reviewed business strategy, pricing strategy, new product development and anticipated launches, product promotion strategy, financial results, sales incentive strategies, existing and prospective customer analyses, proprietary customer and market research results, and other non-public valuable confidential business information.

47.    Heffernan announced his resignation on or near the date that the Tri-Ed acquisition closed, January 31, 2005.

48.    When Heffernan gave notice of his resignation, he disclosed to Honeywell that he planned to join Tri-Ed as its Vice President for the Eastern Region.  His title listed on Tri-Ed's web site is "Regional Sales Manager - Eastern U.S.A."  Heffernan is the only person identified on Tri-Ed's web site as having any sales management responsibility for eastern portion of the United States.  A copy of the most current contact listing for Tri-Ed's senior level employees in the United States and Canada from its web site is attached hereto as Exhibit G.

49.    Upon information and belief, Heffernan's sales territory at Tri-Ed overlaps with the territory that he covered during his last twelve months of employment at Honeywell.

50.    Once Honeywell became aware of Heffernan's intentions to join Tri-Ed, a representative from Honeywell's human resources department attempted to obtain written

certifications from Heffernan and Tri-Ed, confirming the measures they put in place to ensure Heffernan's continued compliance with the Restrictive Covenants. Honeywell reminded Heffernan of the Restrictive Covenants by providing another copy of the Agreement for his review. Honeywell also provided a copy of Heffernan's Agreement to Tri-Ed.

51.    Only Tri-Ed responded to Honeywell's overture by generally stating that it believed Heffernan was complying with all "enforceable" obligations. However, Tri-Ed failed to provide any written detail of the measures it had taken to ensure compliance with the Agreement, and without clarifying which portion(s) of the Agreement it considered to be unenforceable.

52.    Immediately thereafter, in an effort to avoid litigation, counsel for Honeywell issued a letter demanding detailed information and written certification from Tri-Ed and Heffernan, to provide proof that they intended to comply with the Agreement and what steps they had implemented to do so.

53.    Tri-Ed responded to Honeywell's demand letter in a similar general and vague manner described above in paragraph 51.

54.    To date, Heffernan has failed to respond to Honeywell's or its counsel's overtures.

55.    At some point prior to March 4, 2005, Heffernan took steps to solicit a Honeywell employee named Sean Guilfoyle to quit his job and join Tri-Ed. Mr. Guilfoyle tendered his resignation on March 4, 2005, and recently commenced employment with Tri-Ed.

56.    Honeywell has provided valuable consideration to Heffernan for the Restrictive Covenants to which he agreed, and has satisfied all conditions precedent. Throughout Heffernan's employment with ADEMCO and Honeywell, they have always:

- compensated Heffernan in full;

- provided fringe benefits; and

- provided Heffernan with the benefit and support of ADEMCO's/Honeywell's goodwill and business reputation.

57.    Heffernan is employed by a Conflicting Organization, as defined in the Agreement.

58.    Upon information and belief, Heffernan has engaged and continues to engage in the sale or offer for sale of Conflicting Products within his former geographic territory and to his former customers as an employee of a Conflicting Organization.

## COUNT I

### (Breach of Contract)

59.    Honeywell incorporates by reference the allegations contained in paragraph 1 through 58 of this Complaint, as if fully set forth herein.

60.    Heffernan's Agreement contains Restrictive Covenants.

61.    The Restrictive Covenants are intended and necessary to protect Honeywell's legitimate business interests in its goodwill and confidential information.

62.    The Restrictive Covenants are narrowly drawn in time and geographic scope to protect these interests.

63.    The Agreement is a valid and enforceable contract between Heffernan and Honeywell.

64.    Upon information and belief, Heffernan has breached and will continue to breach the Restrictive Covenants.

65.     Upon information and belief, Heffernan has wrongfully disclosed or at a minimum will inevitably disclose Honeywell's confidential and proprietary information to Tri-Ed in the course of his employment with Tri-Ed.

66.     As a result of Heffernan's breach of the Restrictive Covenants, Honeywell has sustained and stands to suffer irreparable injury.  Honeywell has no adequate remedy at law since the damages it suffered, and will continue to suffer, in connection with the divulgence of confidential information, by the loss of competitive advantage, customer goodwill, customers, and revenue is incalculable and irreparable.

67.     Accordingly, a permanent injunction compelling Heffernan's specific performance with the Restrictive Covenants is the only remedy that will afford Honeywell meaningful and immediate relief.

68.     To the extent that Honeywell can identify damages that it has suffered as a result of Heffernan's malfeasance, Honeywell is entitled to recover those money damages and other relief set forth herein.

## COUNT II

### (Breach of the implied covenant of good faith and fair dealing)

69.     Honeywell incorporates by reference the allegations contained in paragraph 1 through 68 of this Complaint, as if fully set forth herein.

70.     Heffernan has breached his implied covenant of good faith and fair dealing, as a result of which Honeywell has been and will continue to be significantly harmed.

71.     Specifically, but without limitation:

(a) Upon information and belief, Heffernan accepted employment with a direct competitor of Honeywell's with the intent to capitalize on Honeywell's

goodwill and confidential business information and divert business from Honeywell to Tri-Ed.

(b) Upon information and belief, Heffernan knew that he intended to join Tri-Ed many weeks before his resignation.

(c) Upon information and belief, Heffernan attended Honeywell's January 2005 sales strategy meeting with the knowledge that he intended to resign immediately afterwards.

(d) Upon information and belief, Heffernan attended Honeywell's January 2005 sales strategy meeting with the intent of gaining the most current knowledge about Honeywell's business plans, marketing strategy, product development and sales and pricing strategies.

(e) Heffernan resigned within days after returning from Honeywell's January 2005 sales strategy meeting.

72.     Upon information and belief, Heffernan wrongfully removed and has failed to return Honeywell's proprietary and confidential business records and other documents and company property.

73.     Upon information and belief, Heffernan has wrongfully disclosed or at a minimum will inevitably disclose Honeywell's confidential and proprietary information to Tri-Ed in the course of his employment with Tri-Ed.

74.     Heffernan is liable to Honeywell for all damages Honeywell sustained as a result of Heffernan's breach of the implied covenant of good faith and fair dealing.

## COUNT III

### (Unfair Competition - Misappropriation of Confidential Information)

75.    Honeywell incorporates by reference the allegations contained in paragraph 1 through 74 of this Complaint, as if fully set forth herein.

76.    In his position as District Sales Manager at Honeywell, Heffernan learned numerous company trade secrets including information of product development, client relationships, and sales, pricing and marketing strategies for products and services, and other confidential and valuable information.

77.    In addition, by attending the sales strategy meeting in January 2005, just before his resignation, Heffernan was privy to Honeywell's most current confidential information.

78.    Heffernan is contractually obligated to refrain from disclosing Honeywell's confidential information.

79.    Heffernan is currently employed at Tri-Ed, a company in direct competition with Honeywell.

80.    Upon information and belief, Heffernan misappropriated Honeywell's confidential information.

81.    Upon information and belief, Heffernan will inevitably use and disclose the confidential information of Honeywell in the course of his employment at Tri-Ed.

82.    Upon information and belief, Heffernan has breached his duty not to disclose Honeywell's confidential information and has misused it to his benefit and the benefit of Tri-Ed knowing that it was misappropriated from Honeywell.

83.     Upon information and belief, Heffernan is using the confidential information gained to compete unfairly against Honeywell, causing Honeywell irreparable loss of goodwill and other incalculable damages.

## COUNT IV

### (Breach of Common Law Duties of Loyalty, Fiduciary Duty and Duty to Preserve Confidential and Proprietary Information by Heffernan)

84.     Honeywell incorporates by reference the allegations contained in paragraph 1 through 83 of this Complaint, as if fully set forth herein.

85.     By engaging in the conduct described above, Heffernan has breached the duty of loyalty and the fiduciary duty owed by him to Honeywell.

86.     By engaging in the conduct described above, Heffernan has also breached his common law duty to preserve confidential and other proprietary information that he learned while employed by Honeywell.

87.     Heffernan's conduct is willful and intentional and has caused and is causing Honeywell irreparable harm and monetary damages.

## COUNT V

### (Declaratory Judgment)

88.     Honeywell incorporates by reference the allegations contained in paragraph 1 through 87 of this complaint, as if fully set forth herein.

89.     A dispute has arisen between the parties to the Agreement concerning the validity of the Agreement and their rights and duties under that Agreement.

90.     Honeywell is entitled to a decree from this Court declaring that the Agreement is valid and specifically enforceable against Heffernan.

91.    Declaratory relief is necessary and appropriate so that Heffernan will appreciate and comply with his obligations under the Agreement.

**WHEREFORE**, Honeywell requests that the Court issue the following relief:

(a)    Enter judgment in its favor and against Heffernan on all Counts of the Complaint;

(b)    Award Honeywell the amount of its direct, consequential, incidental, and special damages to which it may be entitled by reason of Heffernan's unlawful conduct, including damages resulting from lost business, management and training time, recruitment costs, and disruption of Honeywell's business;

(c)    Enter an order enjoining Heffernan from selling or offering for sale, or assisting in any way, including providing assistance to other Tri-Ed employees, the sale of Conflicting Products: (a) in any geographic area which he served or for which he had supervisory responsibility at any time during the one-year period prior to his termination from the Company; or (b) to any customer of the Company on which he called or for which he had supervisory responsibility during the one-year period prior to his termination from the Company;

(d)    Enter an order enjoining Heffernan from disclosing Honeywell's confidential information;

(e)    Enter an order enjoining Heffernan from soliciting or enticing any Honeywell employees to leave their jobs;

(f)    Enter an order requiring Heffernan to provide to counsel for Honeywell a detailed accounting of the customers or potential customers that he has contacted or

solicited thus far as an employee of Tri-Ed (and that are located in his former sales

territory as set forth above) and the result of such contact or solicitation; and

      (g)    Such other relief as the Court may deem just and proper.

Dated: Boston, Massachusetts
       March 23, 2005

              Respectfully submitted,

              HONEYWELL INTERNATIONAL INC.,

              By its attorneys,

              Nathan Kaitz, Esq.  BBO #256760
              Mark M. Whitney, Esq.  BBO #637054
              **MORGAN, BROWN & JOY, LLP**
              200 State Street
              Boston, MA 02109-2605
              Phone (617) 523-6666

## VERIFICATION

     I, Robert T. Shipman state that I am the Vice President of Sales - Eastern Region,

for the Honeywell Security and Custom Electronics division of Honeywell International

Inc.; that I have reviewed the contents of the above complaint; that all matters of fact

stated therein are true; and that as to matters stated therein on the basis of information and

belief, I believe them to be true.

     Signed under the pains and penalties of perjury this 17th day of March, 2005,

                            _Robert T. Shipman_
                            Robert T. Shipman
                            Vice President of Sales - Eastern Region
                            Honeywell Security and Custom Electronics
                            Honeywell International Inc.

# Exhibit A

"Conflicting Organization" means any person or organization (including any person or organization controlled by, controlling or under common control with such person or organization) who or which is engaged in, or is about to become engaged in, research or development, production, marketing or selling of a Conflicting Product.

### Covenants

1.   The Company agrees to employ me or continue my employment and pay my wages in accordance with the terms and conditions upon which we have agreed.  My employment with the Company shall be considered terminated for the purpose of the Agreement as of the date that either party gives written notice to the other party of such termination unless said notice specifies a different date; in which case said specified date shall control.

2.   Except as instructed or authorized in writing by the Company, I will never directly or indirectly use, disseminate, disclose, lecture upon or publish any Confidential Information whether during or after my employment with the Company.

3.   Upon termination of my employment with the Company, all documents, records, notebooks and other materials of any kind containing, referring or relating to Confidential Information, including copies thereof, then in my possession, whether prepared by me or others, will be left with the Company.

4.   During the term of my employment with the Company and for an additional period of one year following termination of such employment I will not directly or indirectly induce or attempt to induce any employee of the Company to quit or abandon his employ for any purpose whatsoever.

5.   During the term of my employment with the Company and for an additional period of one year following termination of such employment, I will not, directly or indirectly, for myself or any Conflicting Organization, sell or offer for sale, or assist in any way in the sale of Conflicting Products:  (a) in any geographic area which I serviced or for which I had supervisory responsibility at any time during the one-year period prior to my termination from the Company; or (b) to any customer of the Company on which I called or for which I had supervisory responsibility during the one-year period prior to my termination from the Company.

6.   All my obligations under this Agreement shall be binding upon my heirs, assigns, and legal representatives, and shall inure to the benefit of the Company and its successors and

assigns.  The provisions of this Agreement relating to my obliga-
tions after the termination of my employ shall continue to be
binding on me in accordance with their terms, notwithstanding the
termination of my employ for any reason.  I warrant that I have
not previously assumed any obligations inconsistent with those of
this Agreement.    This Agreement shall constitute the entire
Agreement of the parties concerning its subject matter and
supercedes all previous agreements, written or oral, relating to
the above subject matter and shall not be changed or modified
except by a writing signed by the parties.

7.    I acknowledge that the Confidential Information which I have
is of a special, unique, unusual and outstanding character which
gives it peculiar value, and that any disclosure of Confidential
Information in violation of this Agreement would be injurious to
the business of the Company and cannot be adequately compensated
in an action at law.    I further acknowledge that violation or
threatened violation of any of the covenants contained in para-
graphs 2 through 5 would be injurious to the business of the
Company and cannot be adequately compensated in an action at
law.    I therefore agree that in the event of any such breach or
threatened breach with respect to Confidential Information or
paragraphs 2 through 5, the Company shall be entitled to an
injunction restraining such breach or threatened breach in
addition to any other rights and remedies available under this
Agreement or otherwise.

8.    This Agreement shall be construed in accordance with and for
all purposes by the internal laws of the State of New York,
without regard to conflicts of law principles notwithstanding the
fact that the Agreement may have been made and executed outside
the State of New York.  For the purposes of securing my compliance
with this Agreement, I hereby consent:    (a) to the exercise of
personal jurisdiction over me by the United States District Court
for the Southern District of New York or by the Courts of the
State of New York; and (b) to the service of process or any other
court paper on me by any form of mail requiring a signed receipt.
The foregoing consents are not intended to preclude:    (a) the
exercise of jurisdiction over me by any other court; or (b)
service on me by any other manner authorized by the Federal Rules
of Civil Procedure.

9.    If any one or more of the provisions contained in this
Agreement shall, for any reason, be held to be invalid, illegal
or unenforceable in any respect, such invalidity, illegality or
unforceability shall not affect any other provisions contained in

Page Four

this Agreement. Should any provision be held to be excessively broad as to time, duration, geographical scope, activity or subject, it shall be construed, by limiting and reducing it, so as to be enforceable to the full extent compatible with the applicable law as it shall then appear.

_____          9/8/86
Employee's signature, including       _____
full first name and middle initial.   Date to be written in by
                                      Employee.

Witness: _____

AGREED:

**ALARM DEVICE MANUFACTURING COMPANY, (ADEMCO)**
**a division of Pittway Corporation**

By _____         _____
Employee's immediate supervisor         Position
or other appropriate Company
representative.

Witness: _____

1/85                                                    P6202

# Exhibit B

## CONFLICT OF INTEREST POLICY

### Statement of Policy

All employees have a clear duty in conducting Company business
to place the interests of the Company ahead of their personal
interests.  For this reason it has been and continues to be
the established policy of the Company that all officers and
employees must avoid any situation which involves a potential
conflict between their personal interests and the interests
of the Company.  Only by adhering to this policy can the integ-
rity of the Company's business relationships be preserved and
the financial and other interests of the Company and its stock-
holders be protected.  Companies failing to enforce such a
policy have experienced disruptive litigation and monetary
losses.  The most important loss, however, is the irreparable
damage to their standing in the community.

### Personnel Subject to This Policy

The Company, as the term is used in this Policy Guide, includes
the Company and all divisions.

The following persons are subject to this policy:

  1.  Officers of the Company

  2.  Officers of each division

  3.  Other persons who hold positions designated, from
      time to time, by the Chief Executive Officer of
      the Company.  In general, the positions designated
      will include those offering opportunities for the
      existence or creation of personal interests that
      would conflict with the Company's interests in any
      of its dealings with outside parties.  Divisional
      managers will recommend the positions in the divi-
      sion to be designated as subject to this policy.

Definitions

For the purposes of this Policy Guide, the terms defined herein shall have the meaning set forth in the definition of each such term.

1.  "Employee" means any officer or employee subject to this policy.

2.  "Immediate family" includes an employee's spouse and the children, parents, brothers and sisters of both the employee and the spouse, as well as other relatives who share the employee's home or otherwise are dependent on the employee or the spouse for their support.

3.  "Confidential information" means any information concerning the affairs of the Company which has not been publicly disclosed by the Company.

4.  "Concern" means any type of business entity, regardless of its form (e.g., corporations, partnerships, sole proprietorships, trusts and joint ventures).

5.  "Competing concern" means any concern which competes with the Company or which competes with anyone who sells the products of the Company.

6.  "Substantial financial interest" means the direct or indirect ownership of a beneficial interest having a value of such magnitude that (a) it represents a substantial part of the equity in the concern or (b) for other reasons the interest would be regarded as significant to the employee. No interest in a mutual fund or in the securities of any publicly held corporation regularly traded on the openmarket shall be deemed to constitute a substantial financial interest if the market value of such interest is less than $25,000.

7.  "Indirect ownership" includes beneficial interests in a concern held either (a) by a trust, corporation, partnership, or other venture in which the employee holds an interest or (b) by or through a nominee, agent, option or other device, as well as beneficial interests derived from loan agreements or other contractual arrangements.

Illustrations of Potential Conflicts of Interest

The basic factor in all conflict situations is the division
of loyalty between the Company's best interests and the
personal interests of the individual. While it is impossible
to list every circumstance giving rise to a possible conflict
of interest, the following illustrations will serve as a
guide to the types of activity involving potential conflicts.

1.  Interest in Competing Concern. Ownership of a
    substantial financial interest in any compet-
    ing concern by an employee or by any member
    of his or her immediate family.

2.  Interest in Any Other Concern. Ownership by an
    employee or by any member of his or her immedi-
    ate family of a substantial financial interest
    in any other concern with which the Company
    does business, directly or indirectly, or which
    is seeking to do business with the Company.

3.  Interest in Transaction. Representation of the
    Company by an employee in any transaction in
    which such employee or any relative of the
    employee or his or her spouse has an interest.

4.  Representation by Relative. Representation of
    the Company by an employee in any transaction
    where the other concern is represented by a
    relative of the employee or his or her spouse.

5.  Use of Confidential Information. Use of or
    disclosure to outsiders of confidential infor-
    mation for the personal profit or advantage of
    any person.

6.  Gifts and Gratuities. Acceptance by an employee
    or any member of his or her immediate family,
    from any competing concern or any other concern
    with which the Company does business or which
    is seeking to do business with the Company, of
    gifts or merchandise of more than nominal value,
    cash or gift certificates in any amount what-
    ever, loans (except from established banking or
    financial institutions), excessive entertainment
    or other substantial gifts of goods or services.

7. Rendition of Services to Other Concerns.
   Rendition of managerial, consultant or any
   other substantial services to any concern
   (including service as a director).

8. Full Time Service. Engaging in outside busi-
   ness or employment incompatible with the
   Company's right to full time and efficient
   service of its employees.

9. Use of Position to Influence Others.  Use of
   one's position with the Company to influence
   any other concern in its dealings with other
   parties for the personal profit or advantage
   of any person.

10. Competition with the Company.  Competing with
    the Company, directly or indirectly, in the
    acquisition or disposition of property, rights
    or interests of any kind, including those in
    which it is known that the Company might be
    interested in the future.

Approval by the Company

No interest in another concern or participation in any trans-
action shall be deemed to involve a conflict of interest if
the interest or participation has been disclosed fully in
writing to, and has been approved in writing by, the Chief
Executive Officer of the Company.

Compliance

For the protection of both the Company and its employees and
to avoid criticism of either, each officer and other employee
subject to this policy will be asked to sign the Acknowledgment
at the bottom of this Policy Guide.  Each executed Acknowledg-
ment will be retained permanently in the employee's personnel
record.  This Policy Guide imposes a continuing obligation on
those to whom it applies.

An officer or employee should promptly inform the appropriate
executive of any change of circumstances relating to this policy.
Written reaffirmation of compliance will be required annually, or
at more frequent intervals if deemed necessary by the President.

_____
DATE

ACKNOWLEDGED

# Exhibit C



_All signatures must be witnessed_
_Maggie_

_____ NAME OF EMPLOYEE

## SALES MANAGEMENT, SALES, CUSTOMER RELATIONS
## AND OTHER KEY EMPLOYEES AGREEMENT RELATING TO
## CONFIDENTIAL INFORMATION AND FIDUCIARY RESPONSIBILITIES

In consideration of my employment or continued employment by the
Company, and of the wages paid me in connection with such employ-
ment, and for other good and valuable consideration, the Company
and I agree as follows:

### Definitions

In this Agreement, the following terms have the meanings stated:

"Company" means Pittway Corporation, including its division,
Alarm Device Manufacturing Company, (ADEMCO) and its subsidiaries,
affiliated companies, successors and assigns.

"Confidential Information" means information disclosed to me or
known by me as a consequence of or through my employment by the
Company, including information conceived, originated, discovered
or developed by me, not generally known about the Company's
business, operations, processes and products, including but not
limited to information relating to research, inventions, dis-
coveries, technologies, improvements, plans, developments,
techniques, formulae, processes, machines, methods of manufacture,
compositions, drawings, models, layouts, projects, purchasing,
accounting, financial affairs, engineering apparatuses, assembly,
quality control, laboratory analysis, testing, application,
strategies, marketing, merchandising, selling, promotional
materials, costs, prices, sales, customers, product development,
trademarks and trade names, whether or not reduced to written or
graphic form.

"Conflicting Product" means any product, technology or process of
any person or organization other than the Company, in existence
or under development, which resembles, competes or is potentially
competitive with a product, technology or process of the Company.

"Conflicting Organization" means any person or organization (including any person or organization controlled by, controlling or under common control with such person or organization) who or which is engaged in, or is about to become engaged in, research or development, production, marketing or selling of a Conflicting Product.

### Covenants

1.    The Company agrees to employ me or continue my employment and pay my wages in accordance with the terms and conditions upon which we have agreed.  My employment with the Company shall be considered terminated for the purpose of the Agreement as of the date that either party gives written notice to the other party of such termination unless said notice specifies a different date; in which case said specified date shall control.

2.    Except as instructed or authorized in writing by the Company, I will never directly or indirectly use, disseminate, disclose, lecture upon or publish any Confidential Information whether during or after my employment with the Company.

3.    Upon termination of my employment with the Company, all documents, records, notebooks and other materials of any kind containing, referring or relating to Confidential Information, including copies thereof, then in my possession, whether prepared by me or others, will be left with the Company.

4.    During the term of my employment with the Company and for an additional period of one year following termination of such employment I will not directly or indirectly induce or attempt to induce any employee of the Company to quit or abandon his employ for any purpose whatsoever.

5.    During the term of my employment with the Company and for an additional period of one year following termination of such employment, I will not, directly or indirectly, for myself or any Conflicting Organization, sell or offer for sale, or assist in any way in the sale of Conflicting Products:  (a) in any geographic area which I serviced or for which I had supervisory responsibility at any time during the one-year period prior to my termination from the Company; or (b) to any customer of the Company on which I called or for which I had supervisory responsibility during the one-year period prior to my termination from the Company.

6.    All my obligations under this Agreement shall be binding upon my heirs, assigns, and legal representatives, and shall inure to the benefit of the Company and its successors and

assigns. The provisions of this Agreement relating to my obliga-
tions after the termination of my employ shall continue to be
binding on me in accordance with their terms, notwithstanding the
termination of my employ for any reason. I warrant that I have
not previously assumed any obligations inconsistent with those of
this Agreement. This Agreement shall constitute the entire
Agreement of the parties concerning its subject matter and
supercedes all previous agreements, written or oral, relating to
the above subject matter and shall not be changed or modified
except by a writing signed by the parties.

7.    I acknowledge that the Confidential Information which I have
is of a special, unique, unusual and outstanding character which
gives it peculiar value, and that any disclosure of Confidential
Information in violation of this Agreement would be injurious to
the business of the Company and cannot be adequately compensated
in an action at law. I further acknowledge that violation or
threatened violation of any of the covenants contained in para-
graphs 2 through 5 would be injurious to the business of the
Company and cannot be adequately compensated in an action at
law. I therefore agree that in the event of any such breach or
threatened breach with respect to Confidential Information or
paragraphs 2 through 5, the Company shall be entitled to an
injunction restraining such breach or threatened breach in
addition to any other rights and remedies available under this
Agreement or otherwise.

8.    This Agreement shall be construed in accordance with and for
all purposes by the internal laws of the State of New York,
without regard to conflicts of law principles notwithstanding the
fact that the Agreement may have been made and executed outside
the State of New York. For the purposes of securing my compliance
with this Agreement, I hereby consent:    (a) to the exercise of
personal jurisdiction over me by the United States District Court
for the Southern District of New York or by the Courts of the
State of New York; and (b) to the service of process or any other
court paper on me by any form of mail requiring a signed receipt.
The foregoing consents are not intended to preclude:    (a) the
exercise of jurisdiction over me by any other court; or (b)
service on me by any other manner authorized by the Federal Rules
of Civil Procedure.

9.    If any one or more of the provisions contained in this
Agreement shall, for any reason, be held to be invalid, illegal
or unenforceable in any respect, such invalidity, illegality or
unenforceability shall not affect any other provisions contained in

Page Four

this Agreement.  Should any provision be held to be excessively broad as to time, duration, geographical scope, activity or subject, it shall be construed, by limiting and reducing it, so as to be enforceable to the full extent compatible with the applicable law as it shall then appear.

_____     _____
Employee's signature, including       Date to be written in by
full first name and middle initial.   Employee.

Witness: _____

**AGREED:**

**ALARM DEVICE MANUFACTURING COMPANY, (ADEMCO)**
**a division of Pittway Corporation**

By _____     _____
Employee's immediate supervisor       Position
or other appropriate Company
representative.

Witness: _____

1/85                                                              P6202

# Exhibit D

333 SKOKIE BOULEVARD, P.O. BOX 3012, NORTHBROOK, ILLINOIS 60065-3012 ● PHONE 312/498-1260 ● CABLE PITTWAY, NORTHBROOK



To the Secretary of Pittway Corporation:

The Company has heretofore issued a "Statement of Policy" to be
followed by officers and other management personnel in carrying
out the business affairs of the Company with integrity, honesty
and in full compliance with all laws and regulations.

In addition, the Company has heretofore issued a separate
"Conflict of Interest Policy" to serve as a guideline for offi-
cers and other employees for the purpose of avoiding any situa-
tion which involves a potential conflict between their personal
interests and the interests of the Company.

This letter is being written for submission to the Chairman of
the Audit Committee of the Company pursuant to the annual reaf-
firmation of compliance requirements of the aforementioned poli-
cies.

I hereby affirm a knowledge and understanding of the Company's
"Statement of Policy" and I know of no transactions or events
that have occurred in 1986 where it might appear to an outsider
that this policy has not been observed, except as follows:

I further affirm that I have continued to comply with the provi-
sions of the Company's "Conflict of Interest Policy" and that
during 1986 there have been no changes in my circumstances relat-
ing to this policy, except as follows:

Date_____          _____
                                        Signature

Name (Please Print)_____

        Division  Alarm Device Mfg. Co. (ADEMCO)_____

# Exhibit E

# Honeywell
# Confidential and Proprietary Information Control Training
# Employee Certification

I hereby certify I fully understand and agree to abide by my continuing responsibility both during my employment and after leaving employment to preserve and protect Honeywell confidential and proprietary information, including: 1) safeguarding all Honeywell proprietary information from loss, theft, unauthorized use or disclosure both during employment and after leaving Honeywell; 2) protecting all confidential and proprietary information received from outside companies or the Government; 3) protecting confidential and proprietary information obtained from other companies during previous employment; and , 4) complying with Honeywell policies regarding protection of confidential and proprietary information.

I hereby certify that, to the best of my knowledge, I have not engaged in any activity nor am I aware of any activity in my areas of responsibility that may have compromised Honeywell confidential and proprietary information (including confidential and proprietary information of others entrusted to Honeywell), or that may be a violation of any Honeywell policy regarding protection of confidential and proprietary information, other than the possible exceptions, if any, described below (attach additional sheets if needed).

12/10/01
Date

Jay P. Herting (Nan)
Name (printed)

Signature

ADEMCO
Business Unit

413-5L7-6617
Telephone Number

(This form will be collected by your facilitator and forwarded to Human Resources for inclusion in your personnel file.)

K:\HUM_RES\Code of Business Conduct\Trainer Tool Kit\Proprietary Info Training Certification.DOC

# Honeywell
## Code of Business Conduct Training
### Employee Certification

I _____ hereby certify that I
(Print Name)

attended a training session on the Code of Business Conduct on _____ / __ / __ .
(Date)

I received a copy of the Code of Business Conduct and understand and agree to abide by

my responsibilities as communicated at the training session and in the Honeywell Code of

Business Conduct.

_____
Sign Name

_____                    _____ / __ / __
Business Unit                                            Date

_____
Location (City, State and/or Country)

(This form will be collected by your facilitator and forwarded to Human Resources for
inclusion in your personnel file.)

# Exhibit F

# Honeywell

# Code of
# Business Conduct

### Your everyday guide
### to business conduct



Approved: January 2003

- The Company will not interfere in our personal lives unless our conduct impairs our work performance or adversely affects the work environment or reputation of the Company.

- The Company will comply with all applicable laws regulating the disclosure of personal information about employees.

Safeguarding Company assets is the responsibility of all directors, officers and employees and Company representatives. We must use and maintain such assets with care and respect while guarding against waste and abuse. Honeywell's ability to serve its customers requires the efficient and proper use of the Company's assets and resources. These include not only physical property, plant equipment and inventory, but other tangible assets such as securities and cash, office equipment and supplies, and information systems. It also includes intangible property such as software, patents, trademarks, copyrights and other proprietary information and know-how.

- We will use Company assets according to all Company policies and procedures, comply with security programs that help prevent their unauthorized use or theft, and abide by all regulations or contractual agreements governing their use.

- We will protect from disclosure or misuse all non-public information pertaining to the Company, including unannounced product and business and financial information, acquisition and divestiture plans, proprietary technical data, competitive position, strategies, customers data, and product costs. Such types of information are considered trade secrets or confidential information.

- Those of us with access to material non-public information about the Company that could affect the price of its securities, such as business strategies, financial results, pending transactions or contracts, new products, or research results, will not trade in Honeywell's securities or the securities of other affected companies, nor will we disclose the information to others until the information has been disclosed to the public.

- Employees or representatives performing work on behalf of Honeywell are not entitled to an expectation of privacy with respect to Honeywell Information Technology resources, except where provided by local law. All computer data created, received, or transmitted using Honeywell Information Technology resources is the property of Honeywell and is not to be considered the private information of the user. Honeywell reserves the right to examine all data for any reason and without notice,

for example, when violations of this Code or other Honeywell policies are suspected. By using Honeywell Information Technology resources, users consent to this monitoring. When warranted, such data will be disclosed to appropriate law enforcement agencies. If a user has questions regarding appropriate use of Information Technology resources, the user should visit the Global IT Security website or contact Global IT Security, the Law Department, or a member of the Integrity and Compliance Program.

- We will take actions necessary to safeguard all passwords and identification codes to prevent unauthorized access to the Company's information systems resources.

- We will safeguard Honeywell's intangible assets, such as proprietary information, intellectual property and innovative ideas. Intellectual property rights, including patents, trademarks, copyrights, trade secrets and know-how must be planned for and managed with the same degree of care as any other valuable asset. New concepts and ideas will be identified for evaluation and protection, as appropriate, to support the long-term and short-term goals of the Company. Where appropriate, ideas should be directed to the Law Department for patent, copyright or trade secret protection.

- We will observe obligations of confidentiality and non-disclosure of confidential information and trade secrets of others, including suppliers and former employers, with the same degree of diligence that employees are expected to use in protecting Honeywell's own confidential information and trade secrets.

- We will respect the legitimate intellectual property rights of others and will not reproduce or use software or other technology licensed from suppliers except as permitted by the applicable license agreement or by law.

- We will not accept or retain unsolicited ideas or inventions from people outside of Honeywell. Receiving unsolicited ideas and inventions can expose the Company to claims of misappropriation of ideas if another organization within Honeywell is working on something similar or already knew about the idea from a different source. Employees receiving unsolicited ideas should send them to the Law Department for handling without reading or sharing them with others.

*Company & Each Other*    Code of Business Conduct

# Exhibit G



We'll do what it takes to deliver

**Product Lines** | **Product FAQs** | **Online Ordering** | **Media Room** | **Specials**

about us | contact us | account application | jobs | home                    **SEARCH**

home > contact > email list

VENDOR UPDATE:



Samsung/GVI has the
full range of products
you'll need for any CCTV
application. Combine
this with Tri-Ed
experience in customer
service and you'll have
what it takes to keep
you and your customers
in the forefront of CCTV
technology.

TRI-ED has all the best
product lines under these
critical categories:

❮ BURGLARY
❮ CCTV
❮ ACCESS
❮ FIRE
❮ SOUND
❮ COMMUNICATIONS
❮ VIEW ALL
  MANUFACTURERS

Fill out our **Customer
Profile Form** so we can
keep you up to date on all
the latest developments.

## Email List

| U.S.A. | | CANADA | |
|---|---|---|---|
| **Bill Donahue** | Director of Sales Western U.S.A. Denver, CO | **Steve Roth** | Chief Executive Officer Canadian Corporate Office |
| **Jay Heffernan** | Regional Sales Manager - Eastern U.S.A. Milford, CT | **Pat Comunale** | Chief Operating Officer Canadian Corporate Office |
| **Candi Hurtt** | Regional Manager Western U.S.A. Phoenix, AZ | **James Rothstein** | Senior Vice President Canadian Corporate Office |
| **John Hyatt** | Systems Manager - U.S.A. Dallas, TX | **David Brady** | Director of Operations Canadian Corporate Office |
| **Brett Gilman** | North American Branch Operations Manager Las Vegas, NV | **Paul Swan** | Director of Marketing Canadian Corporate Office |
| **John Cronkite** | System Specialist - Eastern U.S.A. Milford, CT | **Gabrielle Roeder** | Inventory & Purchasing Manager Canadian Corporate Office |
| **Rob Marchell** | Systems Specialist - Central U.S.A. Dallas, TX | **Bruce Thornhill** | Senior Product Manager - Burglary & Fire Canadian Corporate Office |
| **Eileen Berberich** | Business Development Manager - Northern California Sacramento, CA | **Anita Brunet** | Regional Sales Manager - Western Canada Vancouver, BC |
| **Andreas Perkic** | Business Development Manager - Southern California Garden Grove, CA | **Travis Firth** | Regional Sales Manager - Eastern Canada Toronto, ON |
| **Denise Jeffrey** | Branch Manager Milford, CT | **Gordon Hebb** | Branch Manager Halifax, NS |
| **Andy Barbieri** | Branch Manager Charlotte, NC | **Guy Journeault** | Branch Manager Quebec City, PQ |
| **Michelle Houser** | Branch Manager Virginia Beach, VA | **Paul Fafard** | Branch Manager Montreal, QC |
| **Javier Rosario** | Branch Manager San Juan, PR | **Donald Lamb** | Branch Manager Ottawa, ON |
| **Tim Labenski** | Branch Manager Buffalo, NY | **Adrianna Richards** | Branch Manager Toronto, ON |
| **Steve Aswad** | Branch Manager New Orleans, LA | **Shawn German** | Depot Supervisor Scarborough, ON |
| **Geoffrey Stoliker** | Branch Manager Dallas, TX | **Monique Cherrie** | Branch Manager Winnipeg, MB |
| **Dawn Garcia** | Branch Manager | **Brenda Savoie** | Branch Manager |

|  |  |  |  |
|---|---|---|---|
|  | Denver, CO |  | Calgary, AB |
| **Dana Hill** | Branch Manager<br>Phoenix, AZ | **Paul Feth** | Business Development<br>Manager<br>Calgary, AB |
| **Sigifredo Ruiz** | Branch Manager<br>Las Vegas, NV | **Shauna<br>Lawrence** | Branch Manager<br>Edmonton, AB |
| **James<br>Templeman** | Branch Manager<br>Seattle, WA | **Dave Shelast** | Branch Manager<br>Vancouver, BC |
| **Bob Curran** | Branch Manager<br>Portland, OR |  |  |
| **Cynthia<br>Powers** | Branch Manager<br>Sacramento, CA |  |  |
| **Wayne Mills** | Branch Manager<br>San Leandro, CA |  |  |
| **Dave Swanson** | Branch Manager<br>Riverside, CA |  |  |
| **Mark Harris** | Branch Manager<br>Garden Grove, CA |  |  |
| **Fairlie Long** | Branch Manager<br>North Hills, CA |  |  |
| **Debi<br>Richardson** | Branch Manager<br>San Diego, CA |  |  |
| **Bob Gates** | Business Development Manager<br>New Orleans, LA |  |  |

join our email list!

**product lines | product FAQs | online ordering | specials**
about us | contact us | account applications | jobs | home | privacy policy

%JS 44 (Rev. 11/04)  **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| . (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Honeywell International Inc. | Jay P. Heffernan |

**(b)** County of Residence of First Listed Plaintiff **Morris County, New Jersey**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **Hampden**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Mark M. Whitney, Esq. 617-523-6666
Morgan, Brown & Joy, LLP
200 State Street, Boston, MA 02109

Attorneys (If Known)

**I. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**V. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** ☐ 362 Personal Injury - Med. Malpractice | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 365 Personal Injury - Product Liability | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ 830 Patent ☐ 840 Trademark | ☐ 480 Consumer Credit ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage | **LABOR** ☐ 710 Fair Labor Standards Act | ☐ 810 Selective Service ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury *misappropriation | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | | | |
| ☐ 240 Torts to Land | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of State Statutes |

**. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**I. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. s. 1332
Brief description of cause:
Breach of contract (Non-Competition Agreement)

**II. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**III. RELATED CASE(S) IF ANY** (See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE 3/23/05  SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

300891 - 250.00

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) Honeywell International Inc. v. Jay P. Heffernan

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).

_____ I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

_____ II.  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          * Also complete AO 120 or AO 121 for patent, trademark or copyright cases

__X__ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

_____ IV.  220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

_____ V.   150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(E)). _____

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?
YES ☐   NO ☒

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST?  (SEE 28 USC 2403)   YES ☐   NO ☒
IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
YES ☐   NO ☐

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC 2284?   YES ☐   NO ☒

7. DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL DIVISION OF THE DISTRICT OF MASSACHUSETTS (WORCESTER COUNTY) - (SEE LOCAL RULE 40.1(C)).   YES ☐   NO ☒
OR IN THE WESTERN DIVISION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES)?(SEE LOCAL RULE 40.1(D)).
YES ☐   NO ☒

8. DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN DIVISIONS OF THE DISTRICT?
YES ☒   NO ☐

(a)   IF YES, IN WHICH DIVISION DOES THE PLAINTIFF RESIDE? Not Applicable / Foreign Corporation

9. IN WHICH DIVISION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE? Western (Defendant)

10. IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY GOVERNMENTAL AGENCY OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE IN THE
CENTRAL DIVISION;  YES ☐ NO ☐       OR WESTERN DIVISION;   YES ☐   NO ☐

11. ALTERNATIVE DISPUTE RESOLUTION - IS THIS CASE SUITABLE FOR ADR?  IF SO, BY WHICH ADR? No

EARLY NEUTRAL EVALUATION ☐        MEDIATION ☐        SUMMARY JURY/BENCH TRIAL ☐

MINI-TRIAL ☐        OTHER ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Mark M. Whitney, Esquire

ADDRESS Morgan, Brown & Joy, LLP, 200 State Street, Boston, MA 02109

TELEPHONE NO. 617-523-6666

(Category Form.wpd - 3/28/2000)