UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Western Division

HONEYWELL INTERNATIONAL INC.,

Plaintiff,

v.

JAY P. HEFFERNAN,

Defendant.

Civil Action No.
05- 30072 -MAP

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

Nathan Kaitz, Esq.  (BBO #256760)
Mark M. Whitney (BBO #637054)
**MORGAN, BROWN & JOY, LLP**
200 State Street
Boston, MA 02109-2605
Telephone:  (617) 523-6666
Facsimile:  (617) 367-3125

Dated:  March 23, 2005

## INTRODUCTION

Plaintiff, Honeywell International Inc. ("Honeywell"), submits this memorandum of law in support of its motion, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction. Honeywell is seeking to enforce the unambiguous and reasonable terms of post-employment restrictive covenants executed by the defendant, Jay P. Heffernan ("Heffernan"), a former Honeywell District Sales Manager. As detailed herein, a preliminary injunction is warranted because Honeywell:

- stands to suffer irreparable harm to from the conversion of its goodwill that Heffernan has built up by fostering personal relationships with Honeywell's customers over the past 18 ½ years;

- is entitled to protect its confidential information from disclosure or misuse by Heffernan, especially Honeywell's sales and business strategy for 2005 that Heffernan recently learned by attending a national sales strategy meeting *mere days* before he joined Honeywell's competitor;

- seeks an injunction that is limited in duration and narrowly tailored in geographic scope;

- seeks an injunction that will protect Honeywell's legitimate interests, while at the same time allowing Heffernan to continue his current employment; and

- discovered that Heffernan has already shown a willingness to disregard his legal obligations by resigning just after attending Honeywell's national sales strategy meeting and by his recent hiring of a Honeywell employee.

## FACTS

### Heffernan's Relevant Employment History

Heffernan commenced working for Alarm Device Manufacturing Company ("ADEMCO") on September 8, 1986. At that time, ADEMCO was an unincorporated division of its parent company called Pittway Corporation ("Pittway"). Verified Complaint ¶ 6 ("VC").

Prior to joining ADEMCO, Heffernan had only two years of experience working as a salesman in the alarm industry for a small company in eastern Massachusetts called Lexington Alarm Company. VC ¶ 9. ADEMCO has manufactured and sold hardware for residential and

commercial alarm systems since 1929. ADEMCO is an established and reputable company in the security industry. VC ¶ 10.

As a sales representative for ADEMCO, Heffernan sold to a customer base of security alarm dealers and installers. ADEMCO's customer base within any particular sales territory was largely comprised of a large but finite group of alarm system sales and installation companies, many of which were small, family-owned alarm businesses. Because this customer base was finite, it was therefore critical that Heffernan forge long-term, personal relationships with the customers to keep their business. VC ¶ 11. The credibility and relationships that Heffernan built with ADEMCO's customers was developed while he was associated with the ADEMCO name. VC ¶ 12. Heffernan used the name and reputation of ADEMCO in order to facilitate sales and develop close relationships between ADEMCO and its customers. VC ¶¶ 13-14.

### Heffernan's Restrictive Covenants

In connection with the commencement of his employment, Heffernan executed an agreement that contained certain restrictive covenants, entitled: "Sales Management, Sales, Customer Relations and Other Key Employees Agreement Relating to Confidential Information and Fiduciary Responsibilities" (the "Agreement"). He also acknowledged his receipt of Pittway's conflict of interest policy which further prevented him from disclosing company confidential information. VC ¶¶ 7-8, 15-16. The Agreement specifically contemplates that Pittway's rights could be assigned to a successor company. VC ¶ 17.

Pursuant to the Agreement, "Confidential Information" is specifically defined to mean:

> information disclosed to [Heffernan] or known by [him] as consequence of or through [his] employment by the Company, including information conceived, originated discovered or developed by [him], not generally known about the Company's business, operations, processes and products, including but not limited to information relating to research, inventions, discoveries, technologies, improvements, plans, developments, techniques, formulae, processes, machines, methods of manufacture, compositions, drawings, models, layouts, projects,

- 2 -

purchasing, accounting, financial affairs, engineering apparatuses, assembly, quality control, laboratory analysis, testing, application, strategies, marketing, merchandising, selling, promotional materials, costs, prices, sales, customers, product development, trademarks and trade names, whether or not reduced to written or graphic form.  VC ¶ 18.

Pursuant to the Agreement, "Conflicting Product" means: "any product, technology or

process of any person or organization other than the Company, in existence or under

development, which resembles, competes or is potentially competitive with a product,

technology or process of the Company."  VC ¶ 19.

In return for the compensation and other consideration provided by Pittway (and later

Honeywell), Heffernan agreed to four restrictive covenants in the Agreement (the "Restrictive

Covenants").  VC ¶ 56.  Specifically, Heffernan agreed:

> Except as instructed or authorized in writing by the Company, I will never directly or indirectly use, disseminate, disclose, lecture upon or publish any Confidential Information whether during or after my employment with the Company.
>
> Upon termination of my employment with the Company, all document, records, notebooks and other materials of any kind containing, referring or relating to Confidential Information, including copies thereof, then in my possession, whether prepared by me or others, will be left with the Company.
>
> During the term of my employment with the Company *and for an additional period of one year following termination of such employment* I will not directly or indirectly induce or attempt to induce any employee of the Company to quit or abandon his employ for any purpose whatsoever.  (Emphasis added.)
>
> During the term of my employment *and for an additional period of one year following termination of such employment*, I will not, directly or indirectly, for myself or any Conflicting Organization, sell or offer for sale, or assist in any way the sale of Conflicting Products: (a) in any geographic area for which I had supervisory responsibility at any time during the one-year period prior to my termination from the Company; or (b) to any customer of the Company on which I called or for which I had supervisory responsibility during the one-year period prior to my termination from the Company.  (Emphasis added.)

VC ¶ 22.  Heffernan specifically acknowledged the need for injunctive relief to prevent

the violation or threatened violation of any of the four Restrictive Covenants:

I acknowledge that the Confidential Information which I have is of a special, unique, unusual and outstanding character which gives it peculiar value, and that any disclosure of Confidential Information in violation of this Agreement would be injurious to the business of the Company and cannot be adequately compensated in an action at law. I further acknowledge that *violation or threatened violation* of any of the covenants contained in paragraphs 2 through 5 would be injurious to the business of the Company and cannot be adequately compensated in an action at law. I therefore agree that in the event of any such *breach or threatened breach* with respect to Confidential Information or paragraphs 2 through 5, *the Company shall be entitled to an injunction restraining such breach or threatened breach* in addition to any other rights and remedies available under this Agreement or otherwise. (Emphasis added.)

VC ¶ 23.

### Heffernan's Employment at Honeywell

The division of Honeywell relevant to this suit -- Honeywell Security and Custom Electronics -- manufactures, sells and distributes residential and commercial security technology to alarm system vendors and installers throughout the country. VC ¶ 25.

In early 2000, Honeywell acquired all the outstanding stock of Pittway. The purchase price was approximately $2.1 Billion. In so doing, Honeywell assumed all rights and obligations under Pittway's contracts. Honeywell also purchased ADEMCO's/Pittway's goodwill and all of its customer relationships. VC ¶ 26.

Shortly after the Pittway acquisition, Heffernan received training regarding Honeywell's Confidential and Proprietary Information Control policy. Honeywell trained Heffernan about Honeywell's policies governing the use and protection of confidential information. Heffernan signed an acknowledgement confirming his agreement to abide by Honeywell's confidential information policies. VC ¶ 27. In the years that followed, Honeywell continued to provide refresher training to Heffernan concerning, among other things, Honeywell's Code of Business Conduct which covered use of company confidential information. VC ¶¶ 27-29.

During all of his years as a Honeywell employee (including the last twelve months of his employment), Heffernan was a senior-level District Sales Manager. His sales territory covered the general areas of Western Massachusetts, the Hudson River Valley from the Albany region to the New Jersey border, and all of New Jersey. This was a very lucrative territory which comprised approximate annual revenues in the $15 Million range. Heffernan was solely responsible for sales within this territory. VC ¶ 30.[1]

Heffernan's primary duties as a Honeywell District Sales Manager included:  (a) to help grow Honeywell's business within his geographic territory; (b) to constantly visit customers and establish and maintain customer relationships; (c) to be involved in offering special pricing options for various customers and project-specific pricing options; (d) constant prospecting of potential new customers; (e) working with Honeywell's distributor to identify conversion possibilities (i.e., where a local dealer switches the brand of alarm hardware that they sell and install) and to pursue that potential business; (f) to appear at Honeywell's distributor for "counter days" to appear personally to interact with customers; (g) to entertain valued customers on occasion, when appropriate; (h) to appear at trade shows on behalf of Honeywell; and (i) to prepare business proposals for existing and prospective customers. Heffernan was expected to be a self-starter and direct and supervise his own efforts to accomplish these goals within his territory. VC ¶ 32. As a result of Heffernan's job duties and level within Honeywell, he had considerable first-hand customer relations experience. He knows what materials particular customers preferred to purchase, and how Honeywell would propose special pricing arrangements for particular customers. He knows how Honeywell goes about fashioning unique pricing options to accommodate customer conversions. These arrangements were confidential,

---

[1]    The geographic territory that Heffernan covered during the last 12 months of his employment at Honeywell included the following areas, identified by the first three digits of the postal zip code:  Northern New Jersey:  070-079,085-086,088-089; Southern New Jersey:  080-084,087; New York - Hudson River Valley:  124-127; Northeast New York:  120-123,128-129,133-135, 137-139; and Western Massachusetts:  010-016. VC ¶ 31.

formulated on a customer-by-customer basis, and were not published or distributed. Heffernan also knows which customer relationships may be the most vulnerable and why. VC ¶ 33.

As a senior sales representative for Honeywell, Heffernan sold to the same type of customers that he serviced while employed by ADEMCO. Honeywell's customer base within any particular sales territory was similarly comprised of a large but finite group of alarm system vendors. The identities of Honeywell's potential clients are well known, and can be ascertained by reading the security alarm systems section of the Yellow Pages. It was therefore crucial for Heffernan to establish and maintain long-term, personal relationships with Honeywell's customers to keep their business. VC ¶ 34.

Honeywell paid Heffernan to pursue, establish and foster steadfast relationships with Honeywell's customers. Honeywell underwrote the additional costs beyond Heffernan's wages to accomplish this goal, including but not limited to travel and client entertainment expenses. VC ¶ 35. The credibility and relationships that Heffernan built with Honeywell's customers was developed while he was associated with the Honeywell name. VC ¶ 36. Heffernan used the name and reputation of Honeywell in order to facilitate sales and develop close relationships between Honeywell and its customers. VC ¶ 39. The vast majority of the customers that Heffernan serviced within his territory were customers that he had developed over years of relationship building efforts. VC ¶ 37.

Heffernan worked from his home in Longmeadow, Massachusetts when he was not traveling and visiting Honeywell's customers. In order to perform his job for Honeywell, Heffernan necessarily possessed numerous company documents and other materials containing Honeywell's Confidential Information at his home. VC ¶ 40.

## Heffernan's Breach of Confidentiality and Non-Compete Agreement

On or about January 31, 2005, three former senior executives of ADEMCO acquired a controlling interest in Tri-Ed. VC ¶ 41. Tri-Ed sells and distributes, among other things, security alarm hardware for sale to the commercial and residential alarm system sales and installation markets nationwide. Tri-Ed does not sell or distribute any Honeywell products; rather, it sells and distributes the security products of Honeywell's competitors. VC ¶ 42.

Honeywell believes that Tri-Ed must have contacted Heffernan prior to January 17, 2005, in an attempt to induce him to leave Honeywell and join Tri-Ed after the acquisition. VC ¶ 44. Honeywell also believes that Heffernan interviewed with Tri-Ed and obtained an employment offer on or before January 17, 2005. VC ¶ 45. (These issues will be the subject of discovery.)

During the week of January 17, 2005, Honeywell's Security and Custom Electronics division hosted its annual national sales strategy meeting in Florida. All of its sales managers from around the country attended, including Heffernan. At the meeting, Honeywell executives reviewed business strategy, pricing strategy, new product development and anticipated launches, product promotion strategy, financial results, sales incentive strategies, existing and prospective customer analyses, proprietary customer and market research results, and other non-public valuable confidential business information. VC ¶ 46.

Heffernan announced his resignation shortly after returning from the annual strategy conference and on or near the date that the Tri-Ed acquisition closed, January 31, 2005. VC ¶ 47. When Heffernan resigned he disclosed to Honeywell that he planned to join Tri-Ed as its Vice President for the Eastern Region. His title listed on Tri-Ed's web site is "Regional Sales Manager - Eastern U.S.A." Heffernan is the only person identified on Tri-Ed's web site as having sales management responsibility for eastern portion of the United States. It is therefore

- 7 -

reasonable to assume that Heffernan's current sales territory overlaps with the territory that he covered for Honeywell during his last 12 months of employment. VC ¶¶ 48-49.

Heffernan recently took steps to solicit a Honeywell employee named Sean Guilfoyle to quit his job and join Tri-Ed. Mr. Guilfoyle resigned on March 4, 2005 and commenced employment with Tri-Ed. See Affidavit of Mike Maher, submitted in support of this Motion ¶¶ 3-9; VC ¶ 55.

### Honeywell's Efforts To Stop Heffernan's Conduct Have Been Unsuccessful

Once Honeywell became aware of Heffernan's intentions to join Tri-Ed, a representative from Honeywell's human resources department attempted to obtain written certifications from Heffernan and Tri-Ed, confirming the measures they put in place to ensure Heffernan's continued compliance with the Restrictive Covenants. Honeywell reminded Heffernan of the Restrictive Covenants by providing another copy of the Agreement for his review. Honeywell also provided a copy of Heffernan's Agreement to Tri-Ed. VC ¶ 50. Only Tri-Ed responded to Honeywell's overture by generally stating that it believed Heffernan was complying with all "enforceable" obligations. However, Tri-Ed failed to provide any written detail of the measures it had taken to ensure compliance with the Agreement, and without clarifying which portion(s) of the Agreement it considered to be unenforceable. VC ¶ 51.

Immediately thereafter, in an effort to avoid litigation, counsel for Honeywell issued a letter demanding detailed information and written certification from Tri-Ed and Heffernan, to provide proof that they intended to comply with the Agreement and what steps they had implemented to do so. VC ¶ 52. Tri-Ed responded to Honeywell's demand letter in a similar general and vague manner described above. VC ¶ 53. To date, Heffernan has failed to respond to Honeywell's or its counsel's overtures. VC ¶ 54.

## ARGUMENT

### I. PRELIMINARY INJUNCTION STANDARD

An injunction should be granted when the intervention of the court is essential to protect a party's rights against injuries that would otherwise be irremediable. Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 68 (2nd Cir. 1999).[2] "The basic requirements to obtain injunctive relief have always been a showing or irreparable injury and the inadequacy of legal remedies." Id. at 68; Natsource LLC v. Paribello, 151 F. Supp. 2d 465 (S.D.N.Y. 2001) (same); Lumex, Inc. v. Highsmith, 919 F. Supp. 624, 627 (E.D.N.Y. 1996) (irreparable harm is perhaps the most important requirement with respect to the granting of a preliminary injunction).

A party seeking preliminary injunctive relief must establish: (1) it is likely to suffer irreparable harm and (2) either (a) that it is likely to succeed on the merits or (b) that sufficient serious questions going to the merits make them a fair ground for litigation and balance of hardships tips decidedly in the moving party's favor. North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 43 (2nd Cir. 1999).

Both the Court of Appeals and District Courts have issued preliminary injunctions to employers to prevent ex-employees from breaching a noncompete agreement or from using confidential information on behalf of a competitor. See, e.g., Ticor, *supra*; Lumex, *supra*; Johnson Controls, *supra*; Natsource, *supra*. Honeywell can successfully demonstrate that: (1) it is at serious risk of being irreparably harmed by Heffernan's conversion of its goodwill and by his misappropriation of Honeywell's confidential information; (2) it has a likelihood of succeeding on the merits of claims seeking enforcement of restrictive covenants; and (3) the

---

[2]      While state law applies to the substantive issues in this diversity action, federal law governs the standards for issuing a preliminary injunction. See Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir. 1989). Pursuant to the terms of the Agreement, the parties selected the substantive law of the State of New York to govern any disputes arising from Agreement. See Exhibit C to the Verified Complaint.

hardship Honeywell stands to suffer if no injunction is issued substantially outweighs any possible harm to Heffernan if the injunction is issued.

## II.    HONEYWELL WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS NOT GRANTED

Honeywell is likely to suffer irreparable harm from the threatened loss of established customer relationships, conversion of its goodwill, loss of revenue and misuse of its confidential information if Heffernan is not enjoined from breaching his Agreement.

### A.  The Threatened Loss Of Established Customer Relationships Constitutes Irreparable Harm

Well established law in New York holds that the threatened loss of established customer relationships satisfies the "irreparable harm" element of the preliminary injunction analysis. Ticor, 173 F.3d at 68-69; Natsource, 151 F. Supp. 2d at 467 (same); FMC Corp. v. Taiwan Tainan Giant Indus. Co., 73 F.2d 61, 63 (2nd Cir. 1984); Velo-Bind, Inc. v. Scheck, 485 F. Supp. 102, 109 (S.D.N.Y. 1979) ("By siphoning off plaintiff's carefully gleaned customers, defendants subject plaintiff to a definite possibility of irreparable harm, which increases as long as it continues unrestrained.  What is at stake here is plaintiff's goodwill built up over the years ....").

A pair of controlling cases from the Southern District of New York illustrate how noncompete agreements will be enforced where the former employer's customer base that had been developed over years of servicing customers is threatened.  See, e.g., Johnson Controls v. A.P.T. Critical Systems, Inc., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (Leisure, J.); Ecolab, Inc. v. K.P. Laundry Machinery, Inc., 656 F. Supp. 894 (S.D.N.Y. 1987) (Leval, J.).

In Johnson Controls, a company that provided critical services for building electrical systems sued former employees, alleging breaches of non-solicitation agreements.  323 F. Supp. 2d at 525.  The non-solicitation agreements at issue prevented the former employees from, among other thing, selling competing products to customers that the employees covered while

- 10 -

employed by Johnson Controls for a one-year period. Id. at 530. The court found that the defendants could lure away business from Johnson Controls because they had been "placed in positions that enabled them to maintain and develop significant and unique relationships with JCI's customers." Id. at 532. Based on this, the court held that Johnson Controls had demonstrated a sufficient risk of being irreparably harmed by showing that customer relationships had been built up through years of effort, and that the customers lost to its former employees would not necessarily return if judgment were entered in the company's favor at a later time. Id. at 531. "[G]enerally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." Id. at 532. The court granted preliminary injunctive relief against the defendants. Id.

Similarly, in Ecolab, the court held that a former employee violated his noncompete covenant which prohibited him from accepting orders for any competing products from customers that he had serviced for the former employer within his last year of work. 656 F. Supp. at 894. The court emphasized that the mere presence of the former employee at a meeting where the vice-president of the present employer attempted to solicit the former employer's customer violated the former employee's covenant not to compete. Id. at 899-900. The court specifically stated that, "Ecolab has demonstrated that it will suffer irreparable harm absent preliminary relief. There is a substantial showing that Ecolab can lose a great deal of business and profits if it is not accorded enforcement of its contractual covenant with its employees." Id.

Irreparable harm is also present where the former employer could suffer potential loss of revenue. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn, 73 F. Supp. 2d 425 (S.D.N.Y. 1999). In Merrill Lynch, a former employer who was a provider of financial services sought a preliminary injunction to prohibit former employees from soliciting and effecting account transfers from clients they serviced during their tenure with the former employer. 73 F. Supp. 2d

- 11 -

at 425.  The court held that the former employer was likely to succeed on the merits where it

stood to suffer irreparable harm due to the potential loss of substantial revenue.  Id. at 428-29;

see also, e.g., BDO Seidman v. Hirschberg, 93 N.Y.2d 382, 712 N.E.2d 1220 (1999) (in issuing

order enforcing a restrictive covenant restraining the defendant from servicing the plaintiff's

clients from its Buffalo office, the court recognized the difficulty in establishing lost damages

and held that the plaintiff demonstrated irreparable injury); Webcraft Technologies, Inc. v.

McCaw, 674 F. Supp. 1039 (S.D.N.Y. 1987) (granted preliminary injunction preventing

defendant from disclosing confidential information and from soliciting plaintiff's customers)

The facts of Johnson Controls and Ecolab are strikingly similar to the instant case.  Both

involved restrictive covenants that sought to limit the ability of a former employee to solicit

customers of his former employer for a one-year period.  Honeywell seeks the same here.  These

persuasive and apposite holdings, as well as the other principles set forth above, require that

Heffernan be enjoined from breaching his Restrictive Covenants.

### B.  Threatened Disclosure and Misuse of Confidential Information Constitutes Irreparable Harm

Once confidential information is disclosed, it cannot be retrieved.  Irreparable harm to an

employer may also result where an employee has misappropriated confidential information,

including but not limited to such things as pricing methods and customer preferences.  Johnson

Controls, 323 F. Supp. 2d at 532; FMC Corp., 730 F.2d at 63; see also, e.g., Double-Click, Inc.

v. Henderson, No. 116914/97, 1997 WL 731413, at * 5 (N.Y. Supr. Ct., New York Cty. Nov. 7,

1997) ("Irreparable harm is presumed, where ... trade secrets have been misappropriated.");

Unisource Worldwide, Inc. v. Valenti, 202 F. Supp. 2d 269, 280 (S.D.N.Y. 2002).

The record here shows that Heffernan was exposed to a considerable amount of

Honeywell's confidential information through the course of his employment.  Tri-Ed sells

products that directly compete with Honeywell's products, and Heffernan's new role at Tri-Ed includes his former sales territory. Most striking, however, is the fact that Heffernan waited to resign until *mere days after* he attended Honeywell's annual sales strategy meeting in Florida, where he learned Honeywell's most current confidential information and strategies for the coming year. At a minimum, Honeywell has established that its confidential information is at serious risk of being disclosed and misused, which would cause irreparable harm.

### C. Honeywell Is Without An Adequate Legal Remedy

The damage that can be inflicted upon a company when its former employee breaches a restrictive covenant and converts its goodwill is not readily ascertainable and cannot be satisfied by a remedy at law. The Second Circuit has recognized the difficulty associated with quantifying this potential harm: "[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." Ticor, 173 F.3d at 68-69; see also Johnson Controls, 323 F. Supp. at 532 (and cases cited therein); Ecolab, 656 F. Supp. at 899-900 ("The extent of loss may be very difficult to measure to the point that Ecolab might not be fairly compensated if left to a damage remedy."); Scheck, 485 F. Supp. at 109 (held that the loss of a company's goodwill that has been build up over the years with its customers is not "monetarily ascertainable"). Likewise, the loss of a company's confidential information cannot be adequately satisfied with a remedy at law. FMC Corp., 730 F.2d at 63 ("[I]t is clear that the loss of trade secrets cannot be measured in money damages.").

In addition, the Court should take note that the Agreement specifically provides that "any violation *or threatened violation*" of the restrictive covenants "would be injurious to the Company and cannot be adequately compensated in an action at law." (emphasis added). VC

- 13 -

¶ 23. Under the plain terms of the Agreement and established law, Honeywell does not have an adequate legal remedy and injunctive relief is warranted.

### III.    HONEYWELL WILL LIKELY SUCCEED IN ENFORCING HEFFERNAN'S RESTRICTIVE COVENANTS

By his actions, Heffernan has already breached and threatens to further breach his Agreement. The Agreement, which is reasonable in time and narrowly tailored in geographic scope, is necessary to protect the legitimate business interests of Honeywell. In addition, Heffernan served in a unique capacity because he was *the only* person responsible for cultivating the goodwill between Honeywell and its customers within his sales territory. Due to his unique position and breach of his Agreement, Heffernan could divert customers away from Honeywell. Moreover, the Agreement specifically provides for the issuance of injunctive relief upon a breach ***or threatened breach*** of the restrictive covenants. As set forth below, Honeywell has demonstrated a likelihood of success on the merits and an injunction should issue.

#### A. New York Law Enforces Post-Employment Restrictive Covenants

Post-employment restrictive covenants that include partial restraints of trade are enforceable to the extent reasonable to protect an employers legitimate business interests. Lumex, 919 F. Supp. at 628. Courts will enforce such restrictive agreements if they are reasonable in time and geographic scope and to the extent necessary (1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release or use of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique. See Purchasing Assocs. v. Weitz, 13 N.Y.2d 267, 272-73, 196 N.E.2d 245 (1963); Ticor, 173 F.3d at 69; Natsource, 151 F. Supp. 2d at 473. The restraints at issue here are much less restrictive than others enforced by New York courts because they allow Heffernan to compete with Honeywell, so long as he (a)

does not do so in his former sales territory or with the same customers that he covered during his last 12 months of employment, and (b) does not use Honeywell's confidential information.

## B. The Duration And Geographic Scope Of Heffernan's Restrictive Covenants Are Reasonable

Restrictive covenants are enforced if they are reasonable in time and geographic area. Ticor, 173 F.3d at 69. "In this equation, courts must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood. Ticor, 173 F.3d at 69. "The trend in New York law has been to enforce such covenants when not unduly burdensome." Natsource, 151 F. Supp. 2d at 470.

New York courts have routinely enforced restrictive covenants of one year or more in duration. See, e.g., Johnson Controls, 323 F. Supp. 2d at 529-530 (enforced agreement that prohibited solicitation of former employer's customers for one-year); Natsource, 151 F. Supp. 2d at 478 (enforced a non-solicitation agreement for 90 days as to customers and one-year as to employees of the former employer); Rahn, 73 F. Supp. 2d at 429-30 (restricting former employees from soliciting clients held or known to them during their employment with their former employer for a one-year period); Ecolab, 656 F. Supp. at 898 (one-year period); BDO Seidman, 93 N.Y.2d at 382, 712 N.E.2d at 1220 (18-month period); Webcraft Technologies, 674 F. Supp at 1039 (two-year period); Alside Div. of Assoc. Materials, Inc. v. Leclair, 295 A.D.2d 873, 874, 743 N.Y.S.2d 898, 899 (3d Dep't 2002) (enforced two-year noncompete covenant barring a former sales representative from competing for existing customer relationships).

Courts have also enforced a wide range of geographic restrictive covenants, depending on the circumstances of each particular case. Courts have enforced broad geographic restrictions where necessary and have welcomed narrowly tailored geographic restrictions. See, e.g., Ticor, 173 F.3d at 66 (enforcing a non solicitation agreement that applied to all of New York State).

- 15 -

Heffernan's Agreement prohibits him from competing with Honeywell for one year with respect to the customers that he covered during the last 12 months of employment. The geographic restriction in Heffernan's agreement is likewise narrowly tailored. It prevents him from competing against Honeywell only within the specific sales territory that he covered during the last 12 months of his employment. The Agreement is carefully designed to preserve Honeywell's goodwill with Heffernan's former territory. In effect, the Agreement provides Honeywell a limited period to find a replacement for Heffernan and seek to maintain its customer relationships without having to compete against Heffernan during that period. See, e.g., Johnson Controls, 323 F. Supp. 2d at 532 (noting that one purpose of the noncompete was to allow the former employer a period to transfer the client relationships maintained by the former employees to their replacements).

Because it is narrowly tailored, the Agreement does not limit Heffernan's ability to work as a salesperson in the same field in an unreasonable manner. He is free to represent Tri-Ed anywhere in the country other than his former territory with respect to the sale of Conflicting Products. Heffernan is also free to sell any non-Conflicting Products anywhere, including inside his former territory. Upon these facts and the applicable law, this Court should find that the restrictive covenants are reasonable both in duration and geographic scope.

### C.  The Restrictive Covenants Are Necessary To Protect Honeywell's Legitimate Business Interests

Honeywell's legitimate business interests of maintaining its confidential information and its customer relationships within Heffernan's former territory are at risk by Heffernan's breach and threatened continued breach of his Agreement. The restrictive covenants are necessary to protect those important interests.

Honeywell demonstrated that it is at risk of being harmed by Heffernan's disclosure and misuse of Honeywell's confidential information. See Webcraft Technologies, Inc. v. McCar, 674 F. Supp. 1039 (S.D.N.Y. 1987). In Webcraft Technologies, the Southern District of New York granted a preliminary injunction against a former employee who resigned to work for a competitor where the former employer demonstrated that the departing employee misappropriated confidential information. Id. at 1042. The court held that injunction was necessary where the employee converted information which the former employer considered confidential, including the identity of customers, customer preferences and needs, and knowledge of its pricing and pricing methodology. Id. at 1047.

Honeywell has demonstrated that Heffernan was privy to much of its confidential information through his duties as a District Sales Manager and that he attended the annual sales strategy meeting immediately before resigning to join Tri-Ed. At the annual meeting, Heffernan and other Honeywell executives reviewed business strategies, pricing strategies, new product developments and anticipated launches, financial results and other non-public valuable confidential business information that mapped out Honeywell's business plan for 2005. Heffernan must be enjoined from disclosing Honeywell's confidential information to Tri-Ed or from using it to compete against Honeywell in any territory on behalf of Tri-Ed.

New York law provides an alternative basis for establishing a likelihood of success on the merits. In addition to the standard set forth above, an employee can also be enjoined from breaching his confidentiality and non-competition agreements where the employee is found to be "unique." Ticor, 173 F.3d at 70; Bradford v. New York Times Company, 501 F.2d 51, 58 (2nd Cir. 1974); Natsource, 151 F. Supp. 2d at 468; Maltby v. Harlow Meyer Savage Inc., 166 Misc. 2d 481, 633 N.Y.S.2d 926 (Supr. Ct., New York Cty. 1995), aff'd, 223 A.D.2d 516, 637 N.Y.S.2d 110 (1st Dep't 1996).

In Ticor, supra, the Second Circuit granted an injunction to enforce a six-month noncompete agreement, where his relationships with key customers were found to be unique. The court determined that the inquiry of uniqueness focuses on the employee's relationship to the employer's business rather than on the individual skills of the employee. Ticor, 173 F.3d at 71. Thus, where the employee was the principal contact for various clients, and the business was largely dependent on personal relationships, the non-competition agreement was enforceable. Id.[3] Similarly, in Natsouce, 151 F. Supp. 2d at 465, the Southern District of New York entered an injunction preventing a broker from servicing his former clients for a 90-day period provided within a noncompete agreement. The court held that the broker's relationships with his clients and the skill and talents he developed were "unique" and protectable by use of a non-solicitation agreement. Id. at 474. The court noted that the former employee's skill was "of such a level that it [could not] be easily duplicated, and if he were allowed to compete immediately against Natsource, the firm would be greatly harmed." Id. at 473.

As a District Sales Manager for Honeywell, Heffernan acted as the sole sales contact for the lucrative territory covering Western Massachusetts, the Hudson River Valley from the Albany region to Rockland County, and all of New Jersey. The record shows that Heffernan was paid to nurture Honeywell's relationship with customers and cultivate the goodwill, as well as to develop Honeywell's business and reputation within his territory. The restrictive covenants in Heffernan's Agreement were carefully designed and narrowly tailored to ensure that Honeywell

---

[3]     See also Maltby v. Harlow Meyer Savage Inc., 166 Misc. 2d 481, 486, 633 N.Y.S.2d at 926 (Supr. Ct., New York Cty. 1995), aff'd, 223 A.D.2d 516, 637 N.Y.S.2d 110 (1st Dep't 1996) (currency traders found to be unique because they had "unique relationships with the customers with whom they had been dealing," which were developed while they were employed and partially at the employer's expense); BDO Seidman, 93 N.Y.2d at 382, 712 N.E.2d at 1220 ("The employer ahs a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment.").

would have the opportunity to maintain its current customers and competitive advantage, and to preserve its goodwill in Heffernan's sales territory in the event that he left the company.

Here, as in Ticor and Natsource, Honeywell seeks enforcement of the Agreement to protect its legitimate interests. There is little doubt that the Agreement is reasonable, because it is narrowly tailored to prevent Heffernan from competing unfairly against Honeywell by using its confidential information and, for a one-year period, in the specific territory and with the customers that Heffernan covered. Honeywell has demonstrated that Heffernan has the ability and knowledge to compete unfairly against Honeywell. Honeywell has also demonstrated that Heffernan has joined a direct competitor and his former sales territory is encompassed within his area of responsibility. Accordingly, enforcement of the Agreement is necessary to protect Honeywell's legitimate business interests.

### D. The Express Language Of The Agreement Shows That The Parties Acknowledged That Injunctive Relief Is Warranted Under These Circumstances

Case law in New York embraces the right of the parties right to freely contract and recognizes the prior agreement for injunctive relief as a legitimate factor to consider when deciding whether to grant or deny an injunction. See, e.g., Ticor, 173 F.3d at 69 (the Second Circuit suggested that the contractual concession that injunctive relief is warranted upon a breach of a post-employment restrictive covenant by the former employee "might arguably be viewed as an admission by [former employee] that the plaintiff will suffer irreparable harm" from such breach); Rahn, 73 F. Supp. 2d at 427 (granting preliminary injunction to prevent former employee from soliciting former customer based in part on the fact that the former employees expressly agreed that injunctive relief was warranted).

Heffernan's Agreement specifically anticipates the precise circumstances the parties are now facing. It provides that Heffernan might someday breach or threaten to breach his

obligations and states that Honeywell "shall be entitled to an injunction restraining such breach or threatened breach ...." VC ¶ 23. Based on this alone, injunctive relief if appropriate.

## IV.    THE BALANCE OF HARDSHIP TIPS DECIDEDLY IN FAVOR OF HONEYWELL

Balancing the hardships is easy in this case. Honeywell stands to suffer significant and irreparable harm if injunctive relief is not granted. The potential harm that Heffernan might experience as a result of the requested injunction is minimal, at worst.

Heffernan's employment with Tri-Ed, a direct competitor of Honeywell, jeopardizes the sanctity of Honeywell's legitimate business interests relative to, among other things, its long-term relations with its customers and short-term (i.e., 2005) business development plans.

In contrast, there will be no hardship to Heffernan in enjoining him from the use of Honeywell's confidential information and usurping its customer relationships. Honeywell is simply asking the Court to enjoin Heffernan from violating his contractual agreement and the law. The Agreement does not prohibit Heffernan from earning a livelihood while working for Tri-Ed. Heffernan is free to solicit customers anywhere other than in his former sales territory for the sale of Conflicting Products. Heffernan also may sell non-Conflicting Products within his former territory.

Where the hardship to Heffernan if the requested injunction is issued is significantly less than the harm Honeywell stands to suffer without an injunction, the balance of hardship tips exceedingly in Honeywell's favor. Therefore, Honeywell Motion for a preliminary injunction should be granted by the Court.

## CONCLUSION

For the reasons set forth above, Honeywell's Motion for a Preliminary Injunction should be allowed.

Respectfully submitted,

HONEYWELL INTERNATIONAL INC.,

By its attorneys,

Dated March 23, 2005

Nathan Kaitz, Esq.  BBO #256760
Mark M. Whitney, Esq.  BBO #637054
**MORGAN, BROWN & JOY, LLP**
200 State Street
Boston, MA 02109
617-523-6666